IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

AMY B. MERCHANT,                          :
    Plaintiff                              :         No. 1:22-cv-01506
                                           :
v.                                        :         (Judge Kane)
                                           :
FIRST UNUM LIFE INSURANCE CO.,            :
    Defendant                              :

## MEMORANDUM

In this action arising under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"), Plaintiff Amy B. Merchant ("Plaintiff") and Defendant First Unum Life Insurance Company ("Defendant") have both moved for summary judgment relating to Defendant's denial of Plaintiff's claim for long-term disability benefits.  For the following reasons, the Court will grant Defendant's motion and deny Plaintiff's motion.

## I.  BACKGROUND

### A.  Procedural Background

On September 27, 2022, Plaintiff filed a complaint against Defendant and ITT Industry Holdings Inc., challenging Defendant's denial of long-term disability benefits pursuant to § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).  (Doc. No. 1.)  This case was initially assigned to Magistrate Judge Schwab, who scheduled a case management conference for February 8, 2023.  (Doc. No. 6.)  After the parties stipulated to an extension of time to respond to the complaint (Doc. No. 8), Magistrate Judge Schwab approved the stipulation and rescheduled the case management conference to March 17, 2023 (Doc. No. 10).  In the meantime, Plaintiff filed an unopposed motion to dismiss ITT Industry Holdings Inc. as a defendant in this case (Doc. No. 11), which Magistrate Judge Schwab granted (Doc. No. 13).  Defendant filed an answer to the complaint on January 27, 2023 (Doc. No. 12), and, on March 1, 2023, this case

was reassigned to the undersigned.

The Court thereafter scheduled a case management conference for March 22, 2023. (Doc. No. 14.)  On that date, the parties requested referral to a magistrate judge of this Court to engage in settlement discussions; accordingly, the Court issued an Order referring the case for a settlement conference.  (Doc. No. 18.)  Magistrate Judge Carlson ultimately held a settlement conference with the parties on September 12, 2023, but the conference did not result in a settlement.  The Court held another case management conference with the parties on October 18, 2023, and directed the parties to submit a joint proposed order setting forth dispositive motion deadlines.  The parties did so (Doc. No. 26), and on October 24, 2023, the Court issued the parties' proposed Order directing the filing of motions for summary judgment by December 1, 2023, responses to the motions by December 29, 2023, and reply briefs by January 12, 2024 (Doc. No. 27).

On November 28, 2023, Plaintiff filed her motion for summary judgment (Doc. No. 28) with supporting brief (Doc. No. 28-1) and several exhibits (Doc. Nos. 28-2 through 28-6). Defendant filed its motion for summary judgment on December 1, 2023 (Doc. No. 29), containing a statement of undisputed facts (id. at 3–22), accompanied by a brief in support (Doc. No. 30) and several exhibits (Doc. Nos. 29-3 through 29-7).  On December 28, 2023, Plaintiff filed her brief in opposition to Defendant's summary judgment motion (Doc. No. 31) and Defendant filed its reply brief on January 12, 2024 (Doc. No. 34).  Defendant filed its brief in opposition to Plaintiff's motion for summary judgment on December 29, 2023.  (Doc. No. 32.) Plaintiff did not file a reply brief in further support of her motion.  On January 3, 2024, Defendant filed a letter (Doc. No. 33) attaching an exhibit to its statement of facts contained within its motion for summary judgment (Doc. No. 29 at 3–22), consisting of the administrative

2

record related to Plaintiff's claim for disability benefits.[1]   The cross-motions for summary

judgment are accordingly ripe for disposition.

    **B.**    **Factual Background**[2]

    Plaintiff brought a claim for long-term disability ("LTD") benefits under a group policy

issued by Defendant to her former employer, ITT Industries Holdings Inc. ("ITT").   (Doc. No. 29

at 3 ¶ 1.)   The Policy states that an insured is disabled when (1) they are limited from performing

the material and substantial duties of their regulation [sic] occupation due to sickness or injury;

and (2) they have a 20% or more loss in their indexed monthly earnings due to the same sickness

or injury.   (Id. at 3 ¶ 2.)   To be eligible for LTD benefits, an insured "must be continuously

disabled through [the] elimination period," defined as the lesser of 180 days or the date that short

term disability payments end, if applicable.   (Id. at 4 ¶ 3.)   The Policy provides that benefits will

cease and a claim will end due to part-time work on the earliest of the following: (1) during the

first 12 months of payment, when an insured is able to work in their regular occupation on a part-

---

[1]  Upon apparent instruction from the Clerk of Court, and given the voluminous nature of the administrative record, Defendant submitted the administrative record to the Clerk of Court on CD as opposed to filing it on the docket of this matter.

[2]  The following facts of record are taken from Defendant's Statement of Undisputed Facts ("SUF") (Doc. No. 29 at 3–22), submitted in connection with its motion for summary judgment. Defendant's SUF contains citations to the record at each numbered paragraph.  The Court notes that Local Rule 56.1 requires that "papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the [movant's statement], as to which it is contended that there exists a genuine issue to be tried" and that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."  See L.R. 56.1.  Plaintiff did not file a response to Defendant's SUF; accordingly, the Court will deem those facts admitted in accordance with Local Rule 56.1.  See L.R. 56.1; Williams v. Gavins, No. 1:13-cv-00387, 2015 WL 65080, at *5 (M.D. Pa. Jan. 5, 2021), aff'd sub nom., Williams v. Gavin, 640 F. App'x 152 (3d Cir. 2016). The Court also notes that Plaintiff failed to file a statement of material facts in support of her motion for summary judgment.  See (Doc. Nos. 28; 28-1 through 28-6).  Regardless, the Court has conducted a thorough and impartial review of the record in this matter in addressing the parties' motions.

time basis, but does not; or (2) after 12 months of payments, when an insured is able to work in any gainful occupation on a part-time basis, and does not.  (Id. at 4 ¶ 4.)  Part-time basis is defined as the ability to work and earn between 20% and 80% of indexed monthly earnings.  (Id. at 4 ¶ 5.)

Plaintiff's occupation at the time of her claim was Lean Technician, a role defined by ITT as an individual "responsible for the polishing, assembly, test, and shipment of all manufactured goods by flowing the product at the pull of the customer."  (Id. at 4 ¶ 6.)  In a call with Defendant, Plaintiff provided a description of her job responsibilities as follows: "[Plaintiff] has two rooms that she keeps stocked.  [Plaintiff] inspects valves for pharmaceutical companies, gas field, and oil field.  [Plaintiff] has to test the valves and diaphragms to make sure they are ok, measures them, keeps everyone supplied."  (Id. at 4 ¶ 7.)  During the course of adjudicating Plaintiff's claim for disability benefits, Defendant asked a vocational consultant, Angela Saucier-Tugman, to analyze Plaintiff's occupation, and she concluded as follows:

> The vocational documents have been reviewed and although not an exact match, the occupation in the national economy is closest to a Subassembler, eDOT code 706.381-038.  An employee in this occupation assembles machinery components, such as operating cylinders, electric control cases, transmissions, clutches, and special tools, according to specifications.  These duties are consistent with the job's primary responsibilities noted on the job description of polishing, assembling, testing and shipping of all manufactured goods.  These duties are also consistent with the insured's reports during the IL TPC involving ensuring valves meet quality standards.
>
> Given the responsibilities of this occupation including assembling machinery components, the Subassembler occupation reasonably requires walking frequently.

(Id. at 4–5 ¶ 8.)  Ms. Saucier-Tugman further outlined the physical demands of that occupation as follows:

Physical Demands

Medium Work:

4

Which involves exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible amount up to 10 pounds of force constantly to move objects.

Frequent: Standing, Walking

Occasional: Stooping, Kneeling, Crouching, Crawling

(Id. at 5 ¶ 9.)

On April 17, 2020, Plaintiff presented to her family physician, Caitlin Basile, M.D. ("Dr. Basile"), regarding being high risk for COVID-19 due to her past diagnosis of chronic heart failure. (Id. at 5 ¶ 10.) At the time of her April 17, 2020 visit, Dr. Basile noted that Plaintiff was asymptomatic for chronic heart failure. (Id. at 6 ¶ 11.) Plaintiff reported to Dr. Basile that she "has not been working for the past 5 weeks. She is staying home." (Id. at 6 ¶ 12.) On April 24, 2020, Plaintiff called Dr. Basile "regarding coronavirus concerns. She is scared to go back to work due to her high risk medical conditions. She is wondering if FMLA is an option. She would like to be out of work for 2 weeks starting from 4/20/2020. She was told if she applied for FMLA, she will still be paid." (Id. at 6 ¶ 13.) On May 6, 2020, Dr. Basile completed a questionnaire and advised Defendant that Plaintiff was "suffering from anxiety due to COVID. To remain out until 5/11/2020." (Id. at 6 ¶ 14.) Dr. Basile further advised Defendant that she expected Plaintiff's return on May 11, 2020 would be at full-time capacity. (Id. at 6 ¶ 15.)

On May 9, 2020, Dr. Basile evaluated Plaintiff for anxiety, noting that:

[Plaintiff] called regarding ongoing anxiety related to the COVID outbreak. She continues to struggle with panic attacks related to this and worries about going back to work. She states that she "has only one good day out of 3" and feels she would struggle to work in this condition. She has been on Effexor in the past which helped but she is hesitant to resume this as it caused stomach upset.

(Id. at 6 ¶ 16.) Dr. Basile also noted that Plaintiff's anxiety is an "[o]ngoing issue related to COVID. Requesting to be out of work longer. Discussed that we cannot continue this

5

indefinitely.  Will extend FMLA 1 more week and resume her Effexor." (Id. at 7 ¶ 17.)  Plaintiff ultimately received continuous short term disability ("STD") benefits that were paid through November 20, 2020.  (Id. n.2.)

Plaintiff returned to work temporarily on May 18, 2020, only to leave early due to stomach pain.  (Id. at 7 ¶ 18.)  On May 19, 2020, Dr. Basile evaluated Plaintiff for abdominal pain complaints via a telehealth visit that did not include a physical examination.  (Id. at 7 ¶ 19.) Dr. Basile noted that "[t]his is a recurrent problem.  The current episode started more than 1 year ago (most recent occurrence started yesterday).  The onset quality is sudden.  The problem occurs constantly.  The problem has been unchanged." (Id. at 7 ¶ 20.)  On May 23, 2020, Plaintiff presented at UPMC Lititz with intractable nausea, vomiting, and constipation.  (Id. at 7 ¶ 21.)  Plaintiff was discharged from UPMC Lititz on May 25, 2020 after receiving intravenous fluids and being seen in consultation for gastroenterology.  (Id. at 7 ¶ 22.)

On May 26, 2020, Clifford L. Lomboy, M.D. ("Dr. Lomboy"), of Regional GI performed an esophagogastroduodenoscopy ("EGD") on Plaintiff that was normal.  (Id. at 7 ¶ 23.) Specifically, the EGD was unrevealing, as Dr. Lomboy concluded, "The esophagus was normal. [ . . . ] The pylorus and antrum were normal.  The remainder of the stomach gastric body cardia fundus were also normal [ . . . ].  [The examined] areas of the duodenum were normal."  (Id. at 8 ¶ 24.)  That same day, Plaintiff had another telehealth visit with Dr. Basile, who noted that Plaintiff "has long standing of [abdominal] issues and an extensive work-up which has been negative.  This includes abdominal US, CT scan, HIDA scan, colonoscopy, gastric emptying study, and most recently a normal EGD today." (Id. at 8 ¶ 25.)  Dr. Basile wrote, "I suspect at least some of her symptoms are due to multifactorial functional abdominal pain. [ . . .]  I advised she start her Effexor as I feel there is a component of anxiety driven irritable bowel syndrome

which would benefit from an SNRI.  She plans to pursue disability as a result of her symptoms." (Id. at 8 ¶ 26.)

On June 9, 2020, Dr. Basile completed a Disability and FMLA Medical Certification, stating: "Patient is unable to work due to ongoing nausea [and] abdominal pain.  She cannot eat consistently [and] is diabetic which causes dangerous swings in blood sugar."  (Id. at 8 ¶ 27.) Dr. Basile stated that Plaintiff was unable to work beginning on May 26, 2020, with an expected return date "not anticipated."  (Id. at 8 ¶ 28.)  On July 10, 2020, Dr. Basile wrote a note advising that Plaintiff would be undergoing functional capacity testing and stating that Plaintiff should remain out of work until completion of that testing.  (Id. at 8–9 ¶ 29.)  On July 15, 2020, Dr. Basile completed a questionnaire advising Defendant that Plaintiff was diagnosed with "functional abdominal pain, chronic nausea, diabetes" and now estimating that Plaintiff would be able to return to work on September 1, 2020.  (Id. at 9 ¶ 30.)

On July 22, 2020, Dr. Lomboy returned a blank Attending Physician Statement to Defendant, merely handwriting on the cover page "paperwork should be given to PCP to fill out. Meets no criteria for GI issues r/t [related to] disability."  (Id. at 9 ¶ 31.)  On July 27, 2020, Plaintiff saw Certified Registered Nurse Practitioner ("CRNP") Robert Martin at Regional GI ("CRNP Martin").  (Id. at 9 ¶ 32.)  CRNP Martin noted that Plaintiff has "abdominal pain, dyspepsia as per history of present illness.  Suspect functional cause.  She was seen in January of this year with these complaints and due to symptoms EGD recommended.  EGD done 5/26/20 was unrevealing."  (Id. at 9 ¶ 33.)  During his physical examination, CRNP Martin noted that Plaintiff's abdomen was "[s]oft.  Normal appearance and bowel sounds are normal.  She exhibits no distention and no mass.  There is no tenderness.  There is no rebound and no guarding."  (Id. at 9 ¶ 34.)  CRNP Martin emphasized that this was a "benign abdominal exam as patient

distracted with conversation." (Id. at 9 ¶ 35.)  Accordingly, CRNP Martin subsequently completed a questionnaire expressly certifying that Plaintiff was released to return to work on a fulltime, sustainable basis with no restrictions or limitations as of July 27, 2020.  (Id. at 10 ¶ 36.)

Plaintiff had been treating with nephrologist Jeffrey Martin, M.D. ("Dr. Martin"), prior to her alleged onset of disability.  (Id. at 10 ¶ 37.)  On June 17, 2020, Dr. Martin noted that Plaintiff's bilateral adrenal masses were stable when compared to Plaintiff's prior imaging.  He also noted that Plaintiff has "[h]ypertension with underlying chronic kidney disease," which he thought was also a "component of anxiety."  (Id. at 10 ¶ 38.)  Dr. Martin noted that Plaintiff's blood pressure was in control when she was taking guanfacine as prescribed, but Plaintiff stopped taking the medication contrary to medical advice due to "GI distress."  (Id. at 10 ¶ 39.)  Dr. Martin concluded that Plaintiff had "underlying primary nephrotic process such as Membranous [. . . ] but more likely has secondary glomerulosclerosis or underlying diabetic neuropathy."  (Id. at 10 ¶ 40.)  Dr. Martin also noted that "[i]llicit drug use [was] detected on urine drug screen in 2017 with marijuana and opiates positive.  Amphetamines were negative at that time keep in mind as possible cause of resistant hypertension."  (Id. at 10 ¶ 41.)  During his physical examination, Dr. Martin noted that Plaintiff's abdomen was "[s]oft[.] Bowel sound[s] are normal.  She exhibits no distension.  There is no tenderness."  (Id. at 10 ¶ 42.)  At no time during the course of Plaintiff's claim did Dr. Martin certify that Plaintiff had any restrictions or limitations related to her chronic kidney disease.  (Id. at 11 ¶ 43.)

On August 31, 2020, Plaintiff underwent a functional capacity evaluation ("FCE").  (Id. at 11 ¶ 44.)  On September 2, 2020, Dr. Basile certified that the functional capacity testing report stated that "'[t]he performance levels documents [sic] in this report should be considered as the client's safe maximal abilities.  Based on the client's subjective description of work as an

inspected ITT, [Plaintiff's] demonstrated tolerances are less than the required demands based on

eight hour work day unless otherwise stated.' [. . .] Based on this testing, [Plaintiff] is unable to

work indefinitely."  (Id. at 11 ¶ 45.)

On November 17, 2020, Dr. Basile evaluated Plaintiff, with chief complaint listed as

"Form Completion."  (Id. at 11 ¶ 46.)  Dr. Basile wrote that:

> [Plaintiff] is here to discuss long term disability.  She recently had functional
> capacity testing which showed good effort but severe limitations.  She tells me that
> she continues to deal with low back pain which comes in waves.  She will do well for
> several days and then have a stretch where her pain is very bad.  She is also having
> dizziness which she relates to the nebiovolol and even had a syncopal event.  She
> reports being awake every night with restless leg but does not want to take any more
> medication.  She reports her anxiety is very poorly controlled and she has never been
> on a medication that she can tolerate.

(Id. at 11 ¶ 47.)  Dr. Basile also referred Plaintiff for GeneSight Testing, with the results

concluding that she could use Effexor as directed. (Id. at 12 ¶ 48.)

As part of its evaluation of Plaintiff's LTD claim, Defendant obtained Plaintiff's medical

records from Dr. Basile, Dr. Lomboy/CNRP Martin, Dr. Martin, and Plaintiff's reported

hospitalizations.  (Id. at 12 ¶ 49.)  Defendant first had Plaintiff's records reviewed by Registered

Nurse ("RN") Lisa Whitney ("RN Whitney").  (Id. at 12 ¶ 50.)  RN Whitney concluded as

follows:

> File is supported while EE was inpatient 05/23/20-05/25/20 and through EGD and
> follow up with GI.  Support beyond 07/27/20 GI release is unclear.  Medical notes
> [employee] with [diabetes mellitus] and [hypertension] and difficulty controlling
> these conditions with some compliance issues.  Extensive work up for [employee's]
> GI Symptoms have been unremarkable and multiple [attending physicians] have
> suggested functional abdominal pain.  [Primary care physician] is opining indefinite
> [restrictions and limitations] however appears to be basing this on the [functional
> capacity evaluation] and anxiety.

(Id. at 12 ¶ 51.)  Accordingly, RN Whitney suggested review by an on-site physician ("OSP").

(Id. at 12 ¶ 52.)

Defendant then had Plaintiff's records reviewed by board-certified family physician Steven Kirsch, M.D. ("Dr. Kirsch"). (Id. at 12 ¶ 53.) Dr. Kirsch found that "[t]he claimant's reported symptoms and the attending physician's asserted restrictions and limitations are inconsistent with the medical evidence [. . .]." (Id. at 13 ¶ 54.) Dr. Kirsch's Doctoral Review addressed each of Plaintiff's medical conditions, stating, in pertinent part, as follows:

> A whole person analysis has been completed. Medical Conditions were considered individually and in aggregate. Other medical conditions, including but not limited to hypertension, GERD, and tobacco use disorder, would not rise to a level that would be considered impairing. The elevated blood pressure readings, as documented, would not preclude the performance of occupational demands. Based on the review of the medical records, the claimant has not reported side effects to medications that would be impairing.

> Although she has been diagnosed with anxiety/depression and treated with Effexor, currently she is not receiving care from behavioral health providers. There are no behavioral health providers opining work-related restrictions and limitations related to behavioral health conditions.

> [. . .]

> Regarding her chronic kidney disease, [Plaintiff] was evaluated by Dr. Jeffrey Martin. This nephrology provider has not opined work-related restrictions and limitations related to her chronic medical conditions. Regarding congestive heart failure, hypertension, and atrial fibrillation, the medical record does not reflect additional evaluation with cardiology to assess for cardiovascular causes of symptoms.

> She has not required additional evaluation with the gastroenterology providers. There has not been an escalation in treatment for diarrhea, nausea, and weight changes. Gastroenterologist Dr. Lomboy noted "meets no criteria for GI issues related to disability". R. Martin CRNP released the claimant to [return to work] as of July 27, 2020 and ongoing.

> Given these factors, considered individually and in aggregate, the medical record fails to support that the claimant was precluded from performing the physical and cognitive demands of her occupation, as specified by the vocational resource, on a full-time sustained basis, as of July 27, 2020 and ongoing.

(Id. at 13 ¶ 55.) Dr. Kirsch also concluded that Plaintiff's FCE represented a submaximal assessment of her functional capacity due to her providing submaximal effort:

A functional capacity evaluation was completed on August 31, 2020. The claimant was noted to have poor body mechanics, the inability to lift greater than 10 pounds, and limited ability to ambulate. She reported needing assistance 100% of the time and that pain interferes with 100% of her ability to work. She noted being "overwhelmed with depression." Despite being right-hand dominant, her left grip peak force was 21.3 pounds in position two and was 15.8 pounds in the right hand. This grip strength was "considered low normal when compared to the normal population." The right-hand coefficient of variation was 19.9%, "with values greater than or equal to 15% may be indicators of inconsistent effort." The claimant lifted 10 pounds from floor to shoulder, floor to waist, and further tests were terminated because of poor body mechanics. The claimant was able to ambulate for 1 minute and 38 seconds before experiencing nausea and needing to sit down. She walked at a pace of 75.27 feet per minute (community ambulation 150-200 feet per minute). Pull cart activities also identified elevated coefficient of variance values and the claimant reported low back pain 8/10. "Patient occasionally demonstrated staggering during testing." She was able to sit for 13.5 minutes, stand for 3 minutes, intermittently sit/stand/walk for 90 minutes. She was observed to "fatigue very quickly and was unable to sit or stand due to level of fatigue." The testing lasted for 90 minutes. The evaluator noted the results represent a valid test of her "current safe maximal performance level."

Given her decreased performance on the FCE with the associated increased coefficient of variations documented, the FCE completed on August 31, 2020 represents an estimation of the claimant's submaximal assessment of functional capacity. Of note, the claimant was performing her occupational demands on a full-time sustained basis prior to her last day of work.

(Id. at 14 ¶ 56.)

Dr. Kirsch also contacted Dr. Basile, who advised that the restrictions and limitations she was providing were based on the functional capacity evaluation. (Id. at 14 ¶ 57.) Additionally, Dr. Basile told Dr. Kirsch that Plaintiff had not been compliant with recommendations and was not currently receiving treatment for behavioral health. (Id. at 15 ¶ 58.) Dr. Kirsch also wrote:

Prior to her last day of work, the claimant was able to perform the demands of her occupation on a full-time sustained basis. Despite the history of spinal stenosis in the lumbar area and pain complaints, the medical record does not include evidence of acute musculoskeletal injuries that would impact her functional capacity around her last day of work. In addition, the claimant's hemoglobin A1c was as high as 12.1% in March 2017, despite this chronic elevated glucose level, the claimant was to perform her occupational demands.

Prior to her last day of work, [Plaintiff] reported she had "not been working due to

the COVID-19 crisis." The medical record includes documented telehealth visits on
April 17, 2020, April 24, 2020, and May 8, 2020 for anxiety. The claimant noted
anxiety regarding going to work and anxiety related to the COVID outbreak.

(Id. at 15 ¶ 59.) Accordingly, Dr. Kirsch concluded: "[b]ased on a review of the medical records,

with a reasonable degree of medical certainty, the medical record fails to support that the

claimant was precluded from performing the physical and cognitive demands of the occupation,

as specified by the vocational resource, on a full-time sustained basis, as of July 27, 2020 and

ongoing." (Id. at 15 ¶ 60.)

Defendant then had a second-level review conducted by board-certified family physician

Anup Sanghvi, M.D. ("Dr. Sanghvi"). (Id. at 15 ¶ 61.) Dr. Sanghvi concurred with the

conclusion reached by Dr. Kirsch, writing as follows:

> The claimant's hemoglobin A1c was as high as 12.1% in March 2017. Despite
> the chronic elevated glucose level, the claimant was able to perform her
> occupational demands.
>
> [. . .]
>
> Gastroenterology Dr. Lomboy noted that the claimant meets no criteria for GI
> issues related to disability. Robert Martin CRNP released the claimant to [return
> to work] as of July 27, 2020 and ongoing.
>
> [. . .]
>
> In the context of diabetes mellitus, there was no documented evidence of
> significant clinical findings related to complications of diabetes.
>
> In the context of hypertension, there was no documented evidence of hypertensive
> urgency or hypertensive emergency. There was no documented evidence of lack
> of response to appropriate medications for hypertension.
>
> The documentation did not reveal evidence of significant findings related to BH
> (Behavioral Health) conditions, that would affect [t]he claimant's ability to
> function at [her] occupation, as specified by the vocational resource, on a full-
> time sustained basis, as of July 27, 2020.
>
> There are no specific physical findings in the medical records furnished that
> suggest the insured would be unable to manage the outlined demands.

The records indicate no quantified findings or specific examples of the claimant's presentation to confirm impaired cognitive or physical functioning that would preclude the performance of the tasks reported above.

Therefore, I agree with the OSP that the evidence in the file does not support [t]he insured was precluded from the referenced occupational demands on a full-time sustained basis, as of July 27, 2020 and ongoing.

(Id. at 15–16 ¶ 62.)

On March 29, 2021, Defendant communicated to Plaintiff its denial of her claim for LTD benefits because she was not continuously disabled through the elimination period—i.e., the lesser of 180 days or the end of the STD period. (Id. at 16 ¶ 63.) With Plaintiff contending a last day worked of April 27, 2020, the elimination period ended on October 23, 2020. (Id. at 17 ¶ 64.) Defendant's determination letter included the description of her job as found by vocational consultant Angela Saucier-Tugman. (Id. at 17 ¶ 65.) The letter outlined Plaintiff's treatment history as reflected in her records and the bases for concluding that restrictions and limitations were not supported as of July 27, 2020 and ongoing, stating, in pertinent part:

In order to better understand the restrictions and limitations Dr. Basile was providing, out [sic] physician contacted her. Dr. Basile advised our physician that the restrictions and limitations were based off of your functional capacity examination. Dr. Basile advised our physician your last office visit was on November 17, 2020. Dr. Basile advised us that you have not been compliant with recommendations and you are not currently receiving treatment for behavioral health care.

[. . .]

June 17, 2020, you were treated by your nephrologist Dr. Jeffrey Martin, this provider identified conditions of bilateral adrenal masses, hypertension, diabetes, chronic kidney disease, and nephrotic range proteinuria. Physical exam findings were noted to be normal. As of July 10, 2020, Dr. Basile documented normal multisystem physical exam findings. On July 27, 2020, gastroenterology provider Robert Martin NP noted normal examination findings, your provider noted "functional cause" of abdominal symptoms. When seen by Dr. Basile on September 2, 2020 examination findings were normal except appearing "distressed," tearful, depressed mood, and anxious. On September 11, 2020, Dr. Martin noted an elevated blood pressure of 211/103 with a repeat of 180/80.

13

You saw Dr. Basile on November 17, 2020, your blood pressure remained elevated at 160/82 and the documented physical exam was noted to be normal except cachectic, anxious, and depressed.  Dr. Basile noted that with better control of anxiety, your poor sleep, pain and IBS would be better managed.  No treating provider has identified evidence of abnormalities of balance, range of motion, motor strength, reflexes, and sensation.

On May 26, 2020 you had an upper endoscopy that was normal.  The GeneSight pharmacogenomic test revealed no gene-drug interactions with Effexor.  Dr. Basile noted a "multifactorial functional abdominal pain syndrome."  No additional gastrointestinal workup was recommended.

A functional capacity evaluation was completed on August 31, 2020.  Despite being right-hand dominant, your left grip peak force was 21.3 pounds in position two and was 15.8 pounds in the right hand.  This grip strength was "considered low normal when compared to the normal population."  The right-hand coefficient of variation was 19.9%, "with values greater than or equal to 15% may be indicators of inconsistent effort."  The FCE completed on August 31, 2020 represents an estimation of [sic] your submaximal assessment of functional capacity.

You have not been referred for additional cardiovascular testing and/or physical therapy services.  You have deferred evaluation due to the fear of COVID.  You have not been referred to additional specialist regarding back and joint pain.  Medical services do not reflect escalation in dose of Effexor and/or a referral for behavior health services.

Regarding your chronic kidney disease, Dr. Jeffrey Martin has not opined work-related restrictions and limitations related to your chronic medical conditions.  Regarding congestive heart failure, hypertension, and atrial fibrillation, the medical record does not reflect additional evaluation with cardiology to assess for cardiovascular causes of symptoms.

You have not required additional evaluation with the gastroenterology providers.  There has not been an escalation in treatment for diarrhea, nausea, and weight changes.  Gastroenterologist Dr. Lomboy noted "meets no criteria for GI issues related to disability."  R. Martin CRNP released you to return to work as of July 27, 2020 and ongoing.

Our physicians reviewed all medical records on file and determined that your hypertension, GERD, and tobacco use disorder, would not rise to a level that would be considered impairing.  The elevated blood pressure readings, as documented, would not preclude you from the performance of your occupational demands.

(Id. at 17–18 ¶ 66.)  Accordingly, Defendant determined that "[t]he medical records we have

received do not support that you are precluded from performing the physical and cognitive demands of your occupation on a full-time sustained basis, as of July 27, 2020 and ongoing. Because you did not satisfy the required elimination period, no benefits are payable under the policy and your claim has been closed effective July 27, 2020."

(Id. at 19 ¶ 67.)

On April 21, 2021, Plaintiff submitted an appeal of Defendant's decision, explaining that she did not feel that she can do her job safely and that she had been sick for many years.  (Id. at 19 ¶ 68.)  Although Plaintiff asserted that Defendant did not have enough of her medical history or test results, Plaintiff did not provide any additional information or materials on appeal.  (Id. at 19 ¶ 69.)  On appeal, Defendant had Plaintiff's medical records reviewed by John Coughlin, M.D. ("Dr. Coughlin"), a physician board-certified in endocrinology, diabetes, and metabolism. (Id. at 19 ¶ 70.)  Dr. Coughlin concluded that restrictions and limitations were not supported for continuous lack of capacity, and wrote, in pertinent part:

> There are significant inconsistencies between [Plaintiff's] complaints and results of physical examination by various physicians, laboratory data, and diagnostic testing.
>
> The severe symptoms reported in the FCE report appear inconsistent with the results of physical examinations by various physicians, laboratory data, and diagnostic testing.
>
> [. . . ]
>
> [. . .] [Plaintiff's] last day of work was 3/13/20; she then went on vacation through 3/30/20; called off on 3/31/20, and was on voluntary layoff from 4/1/20 through 4/26/20.  [Plaintiff] stated she was afraid of COVID and was not sure if she would return to work on 4/27/20.  She attempted to return to work on 5/8/20 but only worked half a day due to a flare of her condition.
>
> [. . .]
>
> Support is not found based on fear of contracting COVID-19.  There is no clinical information indicating that [Plaintiff] would be precluded from using PPE and other mitigating activities (ex. appropriate hand washing).

[Plaintiff's] previous medical history is taken into consideration as are her more current complaints such as pain, nausea, vomiting, diarrhea, and limited capacity for movement and exertion (and result of the 8/31/20 FCE).  However, the weight of medical evidence of [sic] file does not provide support for lack of capacity following hospital discharge on 5/25/20.  By 7/27/20 [sic] [Plaintiff] had received follow-up evaluations from Dr. Basile (PCP), Dr. Martin (Nephrology), and NP Martin (GI). Dr. Martin released [Plaintiff] to return to work on a full-time basis without R/Ls as of 7/27/20.

[. . .]

Anxiety is mentioned in a number of the records.  However:

Although Dr. Basile mentions that anxiety possibly aggravates the underlying IBS condition and has recommended the use of an SSRI, there is no further intensification of BH treatment and there is no indication of referral for specialty BH evaluation/treatment as would be expected if a BH condition or conditions were resulting in significant decrease in quality of life and/or work capacity.

[. . .]

Whole person analysis:

All conditions mentioned in the available record were considered, both alone and in combination.

Support is not found for a physical condition, or a combination of physical conditions, resulting in continuous lack of capacity from 4/27/20 through 11/20/20. BH conditions have been mentioned by treating providers, including Dr. Basile. While conditions such as anxiety may be playing an adverse role in blood pressure control and IBS, documentation regarding intensity of evaluation/treatment is insufficient to support lack of capacity based on BH conditions and there are no treating providers opining lack of capacity based on BH conditions.

[Plaintiff] mentions various medication side effects but these are not noted on exam by treating providers.  While there may have been some transitory adverse medication side effects, there is no documentation of chronic medication side effects resulting in lack of capacity.

(Id. at 19–21 ¶¶ 71–72.)

On July 8, 2021, Defendant upheld its claim determination that Plaintiff was not entitled

to LTD benefits because she was not disabled through the elimination period.  (Id. at 21 ¶ 73.)

16

Defendant's letter addressed each of Plaintiff's conditions, recounting her treatment history and explaining that restrictions and limitations were not supported by them individually or in concert. (Id. at 21 ¶ 74.)  Defendant further communicated to Plaintiff Dr. Coughlin's conclusion that "[t]here are significant inconsistencies between your reported complaints and the physical exams, laboratory data, and diagnostic testing.  The severe symptoms reported in the FCE report are inconsistent with the results of physical examinations by various physicians, laboratory data, and diagnostic testing."  (Id. at 21 ¶ 75.)  Based on its independent review on appeal, Defendant upheld the benefits determination and concluded that "[t]he medical conditions listed in the file, either alone or in combination, do not rise to a level of impairment that would limit you from performing the material and substantial duties of your regular occupation on a full-time basis through the elimination period."  (Id. at 21 ¶ 76.)

## II.     STANDARD OF REVIEW

### A.     Summary Judgment Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis that would allow a reasonable factfinder to return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986).  At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.  See id. at 251–52.  In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion."  See A.W.

v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  See Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted.  See Celotex, 477 U.S. at 322.  With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's evidence is merely colorable, conclusory, or speculative.  See Anderson, 477 U.S. at 249–50.  There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts.  See id. at 252.

The summary judgment standard remains the same when addressing cross-motions for summary judgment.  See Transguard Ins. Co. of Am., Inc. v. Hinchey, 464 F. Supp. 2d 425, 430 (M.D. Pa. 2006) (citing Appelmans v. City of Phila., 826 F.2d 214, 216 (3d Cir. 1987)).  "When confronted with cross-motions for summary judgment, . . . 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.'"  Id. (quoting Marciniak v. Prudential Fin. Ins. Co. of Am., 184 F. App'x 266, 270 (3d Cir. 2006) (unpublished)).  "If review of cross-motions reveals no genuine issue of material fact, then judgment may be entered in

favor of the party deserving the judgment in light of the law and undisputed facts."  Id. (citing

Iberia Foods Corp. v. Romeo, 150 F.3d 298, 302 (3d Cir. 1998)).

**B.      Review of ERISA Benefits Denial**

ERISA does not specify the appropriate standard by which courts should review

eligibility decisions.  The Supreme Court has held, however, that the standard of review should

be "guided by principles of trust law," Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111

(1989), and that denial of benefits should generally be "reviewed under a de novo standard

unless the benefit plan gives the administrator or fiduciary discretionary authority to determine

eligibility for benefits or to construe the benefits of the plan," id. at 115.  When discretion is

afforded by the plan, a court must review eligibility decisions under an arbitrary and capricious

standard.  See id. at 111; Estate of Schwing v. The Lilly Health Plan, 562 F.3d 522, 525 (3d Cir.

2009).  Under such circumstances, "a [d]istrict [c]ourt may overturn an administrator's decision

only if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of

law.'"  See Clauss v. Plan, 196 F. Supp. 3d 463, 469 (M.D. Pa. 2016) (quoting Miller v. Am.

Airlines, Inc., 632 F.3d 837, 845 (3d Cir. 2011)).  A benefits eligibility decision is not arbitrary

and capricious if it "is the result of a deliberate, principled reasoning process and if it is

supported by substantial evidence."  See id. (quoting Balmert v. Reliance Standard Life Ins. Co.,

601 F.3d 497, 501 (6th Cir. 2010)).  Substantial evidence exists "if there is sufficient evidence

for a reasonable person to agree with the decision."  See Courson v. Bert Bell NFL Player Ret.

Plan, 214 F.3d 136, 142 (3d Cir. 2000) (internal citation and quotation marks omitted).  Pursuant

to the arbitrary and capricious standard, "the court is not free to substitute its own judgment for

that of the defendants in determining eligibility for plan benefits."  See Abnathya v. Hoffman-La

Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993) (citation omitted), abrogated on other grounds by Metro

Life Ins. Co. v. Glenn, 554 U.S. 105, 112 (2008).

## III.   DISCUSSION

The parties agree that Defendant's decision denying long-term disability benefits to

Plaintiff should be upheld unless it was arbitrary and capricious.  See (Doc. Nos. 28 ¶¶ 3, 15; 29

¶ 5.)[3]  In its motion, Defendant argues that it is entitled to summary judgment because its

decision to deny Plaintiff's long-term disability claim was "rationally and reasonably based on a

comprehensive review of Plaintiff's medical records and consultations with three board-certified

physicians who found that restrictions and limitations were not supported through the elimination

period"; "Plaintiff's own treating gastroenterology providers expressly cleared her to return to

work as of July 27, 2020, well within the elimination period"; and "[n]one of her other alleged

---

[3]   The Court notes that Plaintiff's complaint asserts that the ERISA plan governing her long-term
disability benefits "was funded by a policy of insurance underwritten by Defendant UNUM"
who is "also administrator of The Plan which grants Defendant UNUM full discretion and
authority to determine the eligibility for benefits and to construe and interpret all terms and
provisions of The Plan."  (Doc. No. 1 ¶ 7); see also (Doc. No. 1-2).  Given the discretion
afforded by the relevant plan, the Court appropriately reviews Defendant's decision to deny
Plaintiff long-term disability benefits under an arbitrary and capricious standard.  See Firestone,
489 U.S. at 111; Schwing, 562 F.3d at 525.

Courts have noted an "obvious discongruence" between the Rule 56 summary judgment standard
and the discretionary standard of review for plan determinations.  See Robinson v. Liberty Life
Assur. Co. of Bos., 25 F. Supp. 3d 541, 551 n.7 (M.D. Pa. 2014) (citing Leahy v. Raytheon Co.,
315 F.3d 11, 17 (1st Cir. 2002)).  "On the one hand, the arbitrary and capricious standard
requires only that an administrative decision be supported by substantial evidence, while, on the
other hand, the summary judgment standard inquires whether the entry of judgment is inevitable,
even indulging all reasonable inferences in the nonmovant's favor."  Id. (citing Leahy, 315 F.3d
at 17).  "[T]he degree of deference due to a plan administrator is an underlying legal matter, and,
by contrast, summary judgment provides a procedural mechanism designed to dispose of cases
with no triable issues."  Id. (citing Leahy, 315 F.3d at 17–18).  Accordingly, "the district court
must ask whether the aggregate evidence, viewed in the light most favorable to the non-moving
party, could support a rational determination that the plan administrator acted arbitrarily in
denying the claim for benefits."  See Leahy, 315 F.3d at 18.  In addition, as noted supra, as to
cross-motions for summary judgment, if the Court's review "reveals no genuine issue of material
fact, then judgment may be entered in favor of the party deserving the judgment in light of the
law and undisputed facts."  See Transguard Ins. Co. of Am., Inc., 464 F. Supp. 2d at 430 (citing
Iberia Foods Corp., 150 F.3d at 302).

conditions rose to the level of impairing and, while Plaintiff's primary care physician opined that she was unable to work, that opinion was based on (1) anxiety for which Plaintiff has not treated; and (2) a functional capacity evaluation (FCE) that represented submaximal effort and estimation of capacity." (Doc. No. 29 ¶¶ 6–8.)

In its brief in support of its motion, Defendant expands upon its position that its denial of Plaintiff's long-term disability claim was reasonable and justified by its comprehensive review of Plaintiff's claim. Defendant notes that, under the relevant policy, to be entitled to long-term disability benefits, Plaintiff had to be continuously disabled through the elimination period, which is defined as 180 days from the date of alleged onset of disability; accordingly, based on Plaintiff's alleged disability date of April 27, 2020, Plaintiff had to be continuously disabled until October 23, 2020 to receive long-term disability benefits. (Doc. No. 30 at 6.)

Defendant notes that, in May 2020, Plaintiff's primary care physician, Dr. Basile, referred Plaintiff to Dr. Lomboy, a gastroenterologist, related to her complaint of abdominal pain and irritable bowel syndrome which caused her to leave work on May 18, 2024, after temporarily returning from leave related to her ongoing anxiety about the COVID-19 outbreak. (Id.); see also (Doc. No. 29 ¶¶ 10–20). Defendant notes that on May 26, 2020, Dr. Lomboy performed an Esophagogastroduodenoscopy ("EGD") on Plaintiff and concluded that the EGD was unrevealing, stating that "[t]he esophagus was normal [. . .] The pylorus and antrum were normal. . . [T]he stomach gastric body cardia fundus were also normal. . . [T]he duodenum were normal." (Doc. No. 30 at 6.) Defendant notes that, ninety-one (91) days into the elimination period, on July 27, 2020, Dr. Lomboy cleared Plaintiff to return to work, concluding that she did not have any restrictions or limitations that would support a disability claim. (Id. at 6–7.)

Defendant also notes that, in connection with its evaluation of Plaintiff's long-term

disability claim, it had Plaintiff's medical records evaluated by two board-certified medical

physicians, Dr. Kirsch and Dr. Sanghvi, both of whom concluded that Plaintiff's other medical

conditions, including hypertension, GERD, diabetes, anxiety, chronic kidney disease, congestive

heart failure, and potential medication side effects, did not support her disability claim.  (Id. at

7.)  Defendant notes that Plaintiff's functional capacity evaluation ("FCE") was also considered

by Dr. Kirsch and Dr. Sanghvi but they ultimately concluded that its testing results supporting a

submaximal effort along with its inconsistencies with Plaintiff's physical examinations and lab

testing supported a conclusion that the FCE provided a submaximal estimation of Plaintiff's

functional capacity.  (Id. at 8.)  Specifically, Defendant notes that Plaintiff reported needing

assistance 100% of the time and that pain interfered with 100% of her ability to work; her grip

strength in her dominant hand indicated "inconsistent effort"; and she demonstrated staggering

during testing; however, Dr. Kirsch and Dr. Sanghvi did not find support in Plaintiff's medical

records for these abnormalities, especially in light of the fact that Plaintiff had been performing

her occupational duties on a full-time basis prior to her last day of work.  (Id.)

Defendant maintains that "[b]ecause there was no support that Plaintiff was disabled

beyond July 27, 2020 (and consequently, through the requisite elimination period)," it denied

Plaintiff's claim.  Defendant notes that, upon appeal of her claim, Plaintiff failed to submit any

new information for review, but that Defendant had Plaintiff's medical records reviewed by

another physician, John Coughlin, M.D., who is board-certified in endocrinology, diabetes, and

metabolism and that he concluded that: "[t]he weight of the medical evidence did not support

lack of capacity due to Plaintiff's alleged pain, nausea, vomiting, diarrhea, and capacity for

movement and exertion"; "[t]here was no intensification of behavioral health treatment, which

would be expected if behavioral health (and more particularly, anxiety) were resulting in

significant decrease in work capacity"; [s]upport was not found based on fear of contracting COVID, as Plaintiff could utilize PPE or other mitigating activities (like handwashing)"; "Plaintiff had been cleared to return to work from a gastroenterology standpoint by July 27, 2020"; "Plaintiff's nephrology did not support any restrictions or limitations"; and "[t]he results of Plaintiff's FCE were inconsistent with Plaintiff's presentation during physical examination and lab results." (Id. at 8–9.)

Accordingly, Defendant maintains that it upheld its determination that Plaintiff was not entitled to long-term disability benefits and in doing so, it "communicated the rationale behind its determination in considerable detail, addressing each of Plaintiff's alleged conditions, both individually and in combination." (Id. at 9.)  Defendant maintains that, under the applicable standard of review, its determination that Plaintiff is not entitled to long-term disability benefits was not arbitrary and capricious and it is therefore entitled to summary judgment.  (Id.)

In response to Defendant's motion, Plaintiff challenges two aspects of Defendant's benefits denial as arbitrary and capricious.  (Doc. No. 31 at 1.)  First, Plaintiff takes issue with Defendant's "discrediting of the Functional Capacity Evaluation results."  (Id.)  Plaintiff asserts that the results of the Functional Capacity Evaluation ordered by Plaintiff's treating physician, Dr. Basile, showed that Plaintiff "was able to occasionally lift 10 pounds and that she would be unlikely to tolerate repetitive lifting on a daily basis," supporting the evaluator's conclusion that "[Plaintiff's] demonstrated tolerances are less than the required demands based on an eight-hour work day unless otherwise stated."  (Doc. No. 31 at 2) (quoting Doc. No. 31-2 at 3).  Plaintiff argues that Defendant's conclusion that the results of the FCE did not appear to represent Plaintiff's maximum capacity based on the physical examination findings of Plaintiff's various providers is contrary to the on-site evaluator's observations and Dr. Basile's conclusion based

upon those findings that "[Plaintiff] is unable to return to work indefinitely."  (Doc. No. 31 at 2)

(quoting Doc. No. 31-3 at 2).  Plaintiff "submits that Defendant's ignoring the observations of

the FCE evaluator and ignoring the examinations and opinions of Dr. Basile supports [Plaintiff's]

opinion that Defendant's decision to deny her long term disability benefits was an arbitrary and

capricious decision."  (Doc. No. 31 at 2.)

Second, Plaintiff challenges Defendant's "over reliance on the random note written on a

fax cover sheet purportedly written by [Plaintiff's] gastroenterologist, Dr. Lomboy."  (Doc. No.

31 at 2.)  Plaintiff asserts that "[f]irst of all, the note defers to [Plaintiff's] primary care

physician, Dr. Basile" and "[i]ndeed, Dr. Basile did complete Defendant UNUM's Disability and

FMLA Medical Certification form and concluded that Ms. Merchant was incapacitated and was

unable to return to work."  (Id.)  Plaintiff asserts that she "has had a number of medical

conditions that preclude her from performing the 'material and substantial duties' of her regular

occupation," as confirmed by the opinion of the FCE evaluator and Dr. Basile, and therefore

"Defendant's reliance on one opinion that one claimed symptom may not be disabling to

[Plaintiff], while ignoring the diagnoses of other disabling symptoms renders Defendant's

decision arbitrary and capricious."  (Doc. No. 31 at 2–3.)  The Court addresses each of Plaintiff's

challenges in turn.

The Court first addresses Plaintiff's challenge to Defendant's purported "over reliance"

on a "random note written on a fax cover sheet" by Plaintiff's gastroenterologist, Dr. Lomboy.

The Court notes that Plaintiff appears to refer to Exhibit 17 to Defendant's motion for summary

judgment.  (Doc. No. 29-5 at 17–21.)  That exhibit appears to consist of a July 22, 2020 fax

returning a Disability and FMLA Medical Certification form sent to Dr. Lomboy from Defendant

seeking information about Plaintiff related to her disability claim.  The form has not been filled

out by Dr. Lomboy, and on the cover page a note says "paperwork should be given to PCP to fill out.  Meets <u>no criteria</u> for GI issues R/T disability." (<u>Id.</u> at 18.)  In Plaintiff's brief in support of her own motion for summary judgment (Doc. No. 28-1), Plaintiff characterizes her challenge as one to Defendant's "sole reli[ance] on a [Defendant] form executed by a CRNP in [P]laintiff's gastroenterologist office stating that plaintiff has no disabling gastrointestinal issues" despite the fact that "[t]he letter does not list any basis for that opinion" (<u>id.</u> at 3).

Upon careful review of the record in this case, the Court finds Plaintiff's challenge in this regard unavailing.  The record reflects that Defendant neither "solely" relied on this form in support of its conclusion as to Plaintiff's lack of disability nor does the form lack support for the opinion.  First, the response challenged by Plaintiff is supported by an examination conducted by Certified Registered Nurse Practitioner ("CRNP") Robert Martin on July 27, 2020.  <u>See</u> (Doc. No. 29-5 at 22–26).  The office note from that examination states that Plaintiff had "abdominal pain, dyspepsia as per history of present illness.  Suspect functional cause.  She was seen in January of this year with these complaints and due to symptoms EGD recommended.  EGD done 5/26/20 was unrevealing" and notes that, during the exam, Plaintiff's abdomen was "[s]oft.  Normal appearance and bowel sounds are normal.  She exhibits no distention and no mass.  There is no tenderness.  There is no rebound and no guarding." (<u>Id.</u> at 25, 24.)  The office note further states that this was a "benign abdominal exam as patient distracted with conversation." (<u>Id.</u> at 24.)

Further, as indicated by the undisputed facts of record set forth <u>supra</u>, in denying Plaintiff's claim for long-term disability benefits, Defendant relied not only on the July 22, 2020 note from Dr. Lomboy as to the non-disabling effects of Plaintiff's gastrointestinal issues but also the evaluation of the entirety of Plaintiff's medical records by Dr. Kirsch and Dr. Sanghvi,

two board-certified family medical physicians who concluded that Plaintiff's long-term disability claim was not supported based on any of her conditions.  Specifically, Dr. Kirsch concluded that: "[o]ther medical conditions, including but not limited to hypertension, GERD, and tobacco use disorder, would not rise to a level that would be considered impairing"; "[b]ased on  the review of the medical records, the claimant has not reported side effects to medications that would be impairing"; "[a]lthough she has been diagnosed with anxiety/depression and treated with Effexor, currently she is not receiving care from behavioral health providers" and "[t]here are not behavioral health providers opining work-related restrictions and limitations related to behavioral health conditions"; Plaintiff's chronic kidney disease provider "has not opined work-related restrictions and limitations related to her chronic medical conditions"; "[r]egarding congestive heart failure, hypertension, and atrial fibrillation, the medical record does not reflect additional evaluation with cardiology to assess for cardiovascular causes of symptoms".  (Doc. No. 29-7 at 4–5.)

Dr. Sanghvi similarly concluded as follows regarding Plaintiff's other medical conditions: "[t]hough the claimant reported cardiac conditions including congestive heart failure, hypertension, and atrial fibrillation" there was "no documentation of additional referral or evaluation by a cardiologist for these cardiac conditions"; "there was no documented evidence of significant clinical findings related to complications of diabetes"; "there was no documented evidence of hypertensive urgency or hypertensive emergency" and "[t]here was no documented evidence of lack of response to appropriate medications for hypertension"; "[t]he documentation did not reveal evidence of significant findings related to BH (Behavioral Health) conditions, that would affect the claimant's ability to function at occupation, as specified by the vocational resource, on a full-time sustained basis, as of July 27, 2020".  (Doc. No. 29-7 at 9–10.)

In addition, despite Plaintiff's failure to submit any new information upon appeal of Defendant's denial of her claim, Defendant had another physician, Dr. Coughlin, who is board-certified in endocrinology, diabetes, and metabolism, review Plaintiff's medical records, and his conclusions similarly reflect consideration of all of Plaintiff's medical conditions in addition to her gastrointestinal issues: "insured has type 2 diabetes mellitus, chronic kidney disease, congestive heart failure, history of afib, hypertension, and GERD"; "[i]nsured also sees Dr. Jeffrey Martin (nephrologist) for chronic kidney disease and he has not opined Rs/Ls"; "12/21/2020 FML med cert by Dr. Basile (Family Med) stated insured is unable to work due to ongoing nausea and abdominal pain. Insured cannot stand, sit, walk, or lift for extended periods of time. Rs/Ls are noted to be indefinite"; "Dr. Basile stated she was basing Rs/Ls on the FCE results. Dr. Basile noted the insured has non-functioning kidneys, poor exercise tolerance, nausea/vomiting/diarrhea, chronic kidney disease, diabetes mellitus, and deconditioning.  She stated that insured has not been compliant with the recommendations and is not in BH care currently"; "BH conditions have been mentioned by treating providers, including Dr. Basile. While conditions such as anxiety may be playing an adverse role in blood pressure control and IBS, documentation regarding intensity of evaluation/treatment is insufficient to support lack of capacity based on BH conditions and there are no treating providers opining lack of capacity based on BH conditions".  (Doc. No. 29-7 at 24–25, 35.)

Defendant's reliance on the evaluations of Dr. Kirsch and Dr. Sanghvi (and Dr. Coughlin), all of whom considered all of Plaintiff's medical records and medical conditions, demonstrates that Defendant did not "solely" rely on Dr. Lomboy's note regarding Plaintiff's lack of disability based on gastrointestinal issues.  The undisputed evidence of record demonstrates that Defendant considered all of Plaintiff's medical conditions in connection with

its disability determination, and therefore, Defendant's decision was not arbitrary and capricious
in that regard.  The Court turns to Plaintiff's other challenge to Defendant's denial of disability
benefits—Defendant's discrediting of the FCE in connection with Plaintiff's disability claim.

> Plaintiff's challenge to Defendant's use of the FCE is as follows:
>
> [Plaintiff's] primary care physician, Dr. Basile, ordered a Functional Capacity
> Evaluation.  [Plaintiff] completed the testing.  As for Plaintiff's efforts during the
> testing the evaluator concluded[:] "The biomechanical and physiological changes
> normally observed when an individual is providing a maximal acceptable effort
> during these activities were demonstrated by the client."  The test showed that
> [Plaintiff] was able to occasionally lift 10 pounds and that she would be unlikely to
> tolerate repetitive lifting on a daily basis.  The evaluator concluded, "[Plaintiff's]
> demonstrated tolerances are less than the required demands based on an eight hour
> work day unless otherwise stated."  (FCE report previously marked as Exhibit "B,"
> hereto attached)[.]
>
> Nevertheless, despite the on-site evaluators observations, Defendant concluded that
> the FCE results do not appear to represent maximum capacity.  This alleged
> reasonable opinion was, according to Defendant, based on the physical exam
> findings of [Plaintiff's] other medical providers.  (Denial letter pg. 8 of 11)[.] Of
> course, Defendant ignores the opinion of [Plaintiff's] primary care physician who
> concludes that, "[Plaintiff is unable to return to work indefinitely." (Dr. Basile letter
> previously attached as Exhibit "C," hereto attached)[.]   [Plaintiff] submits that
> Defendant's ignoring the observations of the FCE evaluator and ignoring the
> examinations and opinions of Dr. Basile supports [Plaintiff's] opinion that
> Defendant's decision to deny her long term disability benefits was an arbitrary and
> capricious decision.

(Doc. No. 31 at 2.)

Upon careful review of the record in this case, the Court cannot conclude that
Defendant's discrediting of the FCE conclusion as to Plaintiff's maximum capacity was arbitrary
and capricious because there is sufficient evidence in the record for a reasonable person to agree
with Defendant's assessment of the FCE.  During the FCE (Doc. No. 29-6 at 1–38), Plaintiff
reported that she needed assistance 100% of the time and that pain interfered with 100% of her
ability to work (id. at 4–5); in addition, the grip strength in her dominant hand was an indicator
of "inconsistent effort" (id. at 14); and Plaintiff "occasionally demonstrated staggering during

testing" (id. at 34).  Both Dr. Kirsch and Dr. Sanghvi found no support for the extent of these

abnormalities (Doc. No. 29-7 at 3, 8–10), with Dr. Kirsch noting that Plaintiff had performed her

occupational demands on a full-time basis prior to her last day of work (Doc. No. 29-7 at 3).

Similarly, upon Plaintiff's appeal of Defendant's denial, Dr. Coughlin considered Plaintiff's FCE

results but concluded that they were inconsistent with Plaintiff's presentation during

examinations and laboratory results.  (Doc. No. 29-7 at 28, 33–34.)  To the extent Defendant

discounted the recommendations of the FCE evaluator (and that of Dr. Basile, whose

recommendation was based on the FCE evaluation) in connection with its denial of benefits,

each doctor reviewing Plaintiff's medical file carefully explained his view as to why the FCE did

not accurately depict Plaintiff's functional capacity.  See (Doc. No. 29-7 at 4–5 (Dr. Kirsch), id.

at 8–10 (Dr. Sanghvi), id. at 33–34 (Dr. Coughlin)).

Further, Defendant's reasoning as to the FCE was clearly explained to Plaintiff in the

letter denying her claim and the letter denying her appeal.  The letter denying Plaintiff's

disability claim stated as follows regarding Defendant's interpretation of the functional capacity

evaluation:

> A functional capacity evaluation was completed on August 31, 2020.  Despite being
> right-hand dominant, your left grip peak force was 21.3 pounds in position two and
> was 15.8 pounds in the right hand.  This grip strength was "considered low normal
> when compared to the normal population."  The right-hand coefficient of variation
> was 19.9%, "with values greater than or equal to 15% may be indicators of
> inconsistent effort".  The FCE completed on August 31, 2020 represents an
> estimation of the [sic] your submaximal assessment of functional capacity.

(Doc. No. 29-7 at 14.)  In addition, the letter denying Plaintiff's appeal stated as follows

regarding Defendant's interpretation of the FCE:

> The FCE is one piece of information and by itself would support lack of capacity as
> of the date of the FCE, however; decreased results on grip testing and walking were
> associated with increased coefficients of variations including unreliable results.

29

Although the FCE stated the test results represented valid tests of "current safe maximal performance level", when taking into account the above-noted contemporaneous appearance and physical exam findings by the above-mentioned treating providers, the FCE results do not appear to represent maximum capacity. The severe symptoms reported in the FCE report are inconsistent with the results of physical examinations by various physicians, laboratory data, and diagnostic testing.

As discussed above, behavioral health conditions may be having an adverse effect. However, there are no treating providers opining lack of capacity based on behavioral health conditions and the level of behavioral health intervention is inconsistent with an impairing behavioral health condition(s).

Lack of capacity is not supported based on the August 31, 2020 FCE report.

(Doc. No. 29-7 at 45.)[4] Accordingly, the undisputed facts of record fail to support a conclusion

---

[4] The Court notes that, in connection with her motion for summary judgment, Plaintiff briefly argues that "Defendant ignored the weight-lifting requirements of [Plaintiff's] job description," referencing a general Job Description of Lean Technician from ITT that states "must frequently lift and/or move up to 50 pounds." (Doc. No. 28-1 at 5; Doc. No. 28-2 at 4.) The Court finds this challenge to Defendant's decision unavailing. As Defendant points out, the record reflects that Defendant contacted Plaintiff to understand the nature of her work, and she provided the following description of her job responsibilities: "[Plaintiff] has two rooms that she keeps stocked. [Plaintiff] inspects valves for pharmaceutical companies, gas field, and oil field. [Plaintiff] has to test the valves and diaphragms to make sure they are ok, measures them, keeps everyone supplied." (Doc. No. 29-3 at 53.) Defendant then asked a vocational consultant to assess Plaintiff's occupation based on her description, and she concluded as follows:

The vocational documents have been reviewed and although not an exact match, the occupation in the national economy is closest to a Subassembler, eDOT code 706.381-038. An employee in this occupation assembles machinery components, such as operating cylinders, electric control cases, transmissions, clutches, and special tools, according to specifications. These duties are consistent with the job's primary responsibilities noted on the job description of polishing, assembling, testing and shipping of all manufactured goods. These duties are also consistent with the insured's reports during the IL TPC involving ensuring valves meet quality standards.

Given the responsibilities of this occupation including assembling machinery components, the Subassembler occupation reasonably requires walking frequently. . . .

Physical Demands

Medium Work:

that Defendant's treatment of the FCE results was "without reason," or arbitrary and capricious.

See Abnathya, 2 F.3d at 45.[5]

## IV.   CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff's challenge to Defendant's

decision fails.  Plaintiff has not demonstrated that Defendant's denial of long-term disability

benefits was arbitrary and capricious.  Accordingly, the Court will grant summary judgment in

favor of Defendant and deny Plaintiff's motion for summary judgment.  An appropriate Order

follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania

---

Which involves exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible amount up to 10 pounds of force constantly to move objects.

Frequent: Standing, Walking

Occasional: Stooping, Kneeling, Crouching, Crawling

(Doc. No. 29-3 at 55–56.)  Accordingly, Defendant's vocational consultant determined that the physical demands of Plaintiff's job (as described by her) required Plaintiff to exert "20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible amount up to 10 pounds of force constantly to move objects." (Id. at 56.) Therefore, the record reflects that Defendant had a reasonable basis (i.e., the vocational consultant's assessment) to determine that the physical demands of Plaintiff's job involved the exertion of 20 to 50 pounds of force occasionally and/or 10 to 25 pounds of force frequently.

[5]  The Court finds Plaintiff's reliance on Rizzo v. First Reliance Standard Life Ins. Co., No. 20-01144, 2022 WL 17729430, at *4 (3d Cir. Dec. 16, 2022) (unpublished) unavailing.  In that case, a panel of the Third Circuit found an insurer's denial of a claim arbitrary and capricious for three reasons: (1) the denial letter did not clearly state what medical conditions were evaluated or how the insurer evaluated the weight to be given to certain information; (2) the timing of the insurer's decision violated ERISA regulations and the insurer's own procedures; and (3) the insurer issued a decision prior to the collection of all relevant information.  See Rizzo, 2022 WL 17729430, at *5.  As reflected by the Court's discussion supra, none of those reasons apply to the case at bar.